# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **STEVEN LEON,** *ex rel* | : | |
| **DENISE LEON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:10-CV-00041-AJB** |
| | : | |
| **MICHAEL J. ASTRUE,** | : | |
| ***Commissioner of Social Security*,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>ORDER AND OPINION</u>[1]

Plaintiff Denise Leon ("Plaintiff")[2] brought this action pursuant to sections

205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to

obtain judicial review of the final decision of the Commissioner of the Social Security

Administration ("the Commissioner") denying her application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social

---

[1]   The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [*See* Dkt. Entry dated 02/02/2010].  Therefore, this Order constitutes a final Order of the Court.

[2]   The Court recently granted a motion to substitute Steven Leon for Denise Leon as Plaintiff in this case.  [Doc. 25].  In this Order and Opinion, however, the Court will refer to Ms. Leon as Plaintiff.

Security Act ("the Act").[3]  For the reasons stated below, the undersigned **REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on January 16, 2007, alleging disability commencing on May 28, 2006.  [Record (hereinafter "R") 11; *see also* R26].[4] Plaintiff's applications were denied initially and on reconsideration.  [*See* R62, 66, 78,

---

[3]      Title II of the Social Security Act provides for federal disability insurance benefits.   42 U.S.C. § 401 *et seq*.   Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for supplemental security income benefits for the disabled.   Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)). Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI.  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI.  However, different statutes and regulations apply to each type of claim. Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

[4]      The Court is unable to find these applications in the case record, so the Court relies on the Administrative Law Judge's opinion.  Apart from that opinion, there is some indication that the applications were completed in January 2007, [R26, 163], while the application summaries indicate that the applications were completed on February 6, 2007, [R134, 139].

2

82].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").

[R86].  An evidentiary hearing was held on June 25, 2009.  [R25, 101, 106].  The ALJ

issued a decision on July 17, 2009, denying Plaintiff's application on the ground that

she had not been under a "disability" at any time through the date of the decision.  [R8,

11-22].  Plaintiff sought review by the Appeals Council, and the Appeals Council

denied Plaintiff's request for review on October 23, 2009, making the ALJ's decision

the final decision of the Commissioner.  [R1].

Plaintiff then moved to proceed *in forma pauperis* in this Court on December 22,

2009, which was subsequently granted, permitting Plaintiff to seek review of the

Commissioner's decision.  *Leon v. Michael J. Astrue, Commissioner of Social Security*,

Civil Action File No. 1:10-cv-0041.  [*See* Doc. 2].  The answer and transcript were filed

on April 1, 2010, [*see* Docs. 7-8], and the Court heard oral arguments, [*see* Doc. 15].

The matter is now before the Court upon the administrative record, the parties'

pleadings, the parties' briefs, and the parties' oral arguments, and is accordingly ripe

for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

3

## II.   STATEMENT OF FACTS

### A.   Factual Background

Plaintiff was born on March 20, 1959.  [R27].  At the time of the hearing before the ALJ, she was fifty years old.  [R27].  Plaintiff had received her GED, and she lived with her mother, who was seventy-one at the time of the hearing.  [R28].  Plaintiff died on December 28, 2009.  [Doc. 16 at 1].

### B.   Medical Records [R243-566]

From 1999-2001, Plaintiff was treated at the Brooklyn Mental Health Service ("BMHS") for stress-related issues, and she was diagnosed with major depression. [R243-61].  On November 29, 2004, Jeanell Perry, Ph.D., of BMHS noted that Plaintiff "was recently suspended because [of] a verbal altercation between her and her supervisor.  She works in an extremely stressful situation (911).  In addition to stress on the job she has ongoing chronic health concerns[.]"  [R263].  Dr. Perry noted both health- and job-related stressors and diagnosed Plaintiff with major depression.  [R253].

4

In August 2006, Plaintiff tested positive for herpes type 2.[5]   [R272].   In December 2006, Plaintiff was seen at the Cobb County Community Services Board ("CCCSB"), where a "licensed assessor" noted that Plaintiff reported isolation, feelings of worthlessness, racing thoughts, and crying spells.  [R323, 342].  Plaintiff reported being very angry at the man who infected her with herpes; she stated she felt like going to his house and hurting him but that she had not done so because she knew her mother needed her.  [R323, 342].

In February 2007, Plaintiff was seen by Brenda Wilson, M.D., at CCCSB. [R337, 343].  Dr. Wilson indicated that Plaintiff felt depressed, anxious, overwhelmed, and tired, that Plaintiff was dealing with the loss of her sister and father as well as the events at the World Trade Center, and that Plaintiff had a lack of energy and poor sleep. [R337, 343].  Dr. Wilson's diagnostic impression was bipolar disorder.  [R337, 343]. At another February 2007 appointment, with Loyce Shurling, R.N., Plaintiff reported

---

[5]        Herpes simplex virus type 2 usually results in sores on the buttocks, penis, vagina, or cervix.  *See* American Academy of Dermatology, Herpes Simplex, http://www.aad.org/public/publications/pamphlets/viral_herpes_simplex.html   (last visited 03/22/11).

AO 72A
(Rev.8/8
2)

that her Seroquel[6] was not working well, that she had vivid dreams that gave her anxiety attacks, and that her mind would not be quiet.  [R336].

On April 24, 2007, Abraham Oyewo, M.D., completed a Social Security Administration case analysis form, in which he briefly reviewed Plaintiff's abdominal pain, gynecological problems, and herpes treatment.  [R287].  He stated that there was no evidence of severe physical impairments that would prevent Plaintiff from participating in work-related activities.  [R287].

On May 22, 2007, David Rush, Ph.D., conducted a psychological evaluation of Plaintiff on behalf of the state agency.  [R288-91].  Dr. Rush noted that Plaintiff had high blood pressure, did not have a primary care physician, was uninsured, was not managing her herpes because she could not afford medication, had asthma and an ulcer, and suffered from "ruminations and persistent worrying" that exacerbated both her herpes and ulcer.  [R288].  Dr. Rush also wrote that Plaintiff was seen by a psychiatrist in 2004 who diagnosed her with bipolar disorder.  [R289].  At the time of her evaluation by Dr. Rush, Plaintiff's medications were 300mg Seroquel bid, 5mg

_____

[6]    Seroquel (quetiapine) is used to treat the symptoms of schizophrenia, mania, and depression.  *See* MedlinePlus, Quetiapine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html  (last visited 03/10/11).

6

Buspirone qd,[7] and 25 mg "Limictal" qd.[8]  [R289].  She reported feeling "numb, but calmer with the medications."  [R289].  Dr. Rush also noted Plaintiff's employment history and her current daily activities:

> Ms. Leon has been unemployed since May 2006.  She left her job as a dispatcher at Peachtree Center Security after eight month[s] to care for her ailing mother.  She did note that she often became irritated by her coworkers and often became engaged in arguments.  Prior to working security, she worked as a scheduler for Atlanta Southeast Airlines from August 2005 to September 2005.  She quit her job because she was reportedly having difficulty catching on and understanding her duties.  Prior to working at the airline, she worked for a few months in sales for MCI before she was laid off.  Before working for MCI she worked as a 911 police dispatcher for the city of New York for 12 years.  She denied difficulties on the job, but noted that it was very stressful and she wanted a change.

> On a typical day, Ms. Leon generally lays on the couch and watches T.V.  She used to attend and enjoy church, but has lost interest.  She currently drives, cooks, cleans, and manages her finances.  She currently lives with her mother whom she depends on financially.

---

[7]     Buspirone is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety.  MedlinePlus, Buspirone, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html (last visited 03/22/11).

[8]     Non-extended-release Lamictal (lamotrigine) tablets are used to treat seizures in people who have epilepsy and are also used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder.  *See* MedlinePlus, Lamotrigine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html (last visited 03/22/11).

7

[R289].

Regarding Plaintiff's mental status, Dr. Rush noted that Plaintiff denied suicidal ideation but occasionally fantasized about hurting previous lovers.  [R289].  He noted that Plaintiff was alert and oriented, her affect was calm, her short-term memory, concentration, and attention were intact, and she described her mood as "numb." [R290].  Plaintiff reported difficulty falling and staying asleep, and she reported experiencing symptoms of depression, fatigue, feelings of worthlessness and guilt, and crying spells within the previous two months, as well as intense feelings of restlessness, irritability, and persistent worrying.  [R290].  Plaintiff stated that she was always feeling restless and worrying about her psychiatric and health problems.  [R290]. Dr. Rush diagnosed Plaintiff with bipolar disorder and generalized anxiety disorder. [R290].  In his summary, Dr. Rush reported among other things that Plaintiff was experiencing a depressive episode and symptoms of anhedonia, depressed mood, disturbed sleep and appetite, fatigue, and feelings of worthlessness and guilt.  [R290]. He also noted: (1) she appeared able to understand, remember, and carry out detailed instructions; (2) psychologically, she was likely to function in a low-stress, minimally demanding setting; (3) she was currently likely to adhere to a work-like schedule and meet production norms; (4) she was likely to have poor interactions with employees,

8

coworkers, and public, given that she had had frequent arguments and fights with others in the past; (5) she was prone to uninhibited angry emotional outbursts that might alienate all other parties involved; and (6) she was capable of managing funds independently, if awarded.  [R290-91].

On May 29, 2007, Celine Payne-Gair, Ph.D., completed a psychiatric review technique form ("PRTF").  [R294-307].  She noted that Plaintiff was bipolar, that Plaintiff suffered from anxiety, and that Plaintiff had mild functional limitations with respect to activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  [R297, 299, 304].

At a June 2007 CCCSB appointment, Plaintiff reported that she was stressed, burnt out, and overwhelmed, that she was "afraid I could hurt someone/explode if someone pushes my buttons the right way," and that she was afraid of herself.  [R331].

At an August 2007 CCCSB appointment, the treatment notes indicated that Plaintiff's mood was "ok," her motivation/energy was decreased, her sleep and appetite had improved, and her thought process was organized.  [R329].

In October 2007, Melody Sewell, A.P.R.N. (advanced practice registered nurse), saw Plaintiff at CCCSB.  [R387].  Plaintiff's Seroquel was increased to 400mg twice

per day and her BuSpar (buspirone) was substituted for Remeron[9] for her persistent anxiety, depression, and insomnia.  [R387, 432].  Notes from a November 2007 appointment with Ms. Sewell noted no improvement in mood and that Plaintiff "continues to present with a pressured, explosive, racing, mixed bipolar presentation even on higher dose of Seroquel XR 800mg QPM.  Will transition to Zyprexa[10] and assess response."  [R431].

On November 15, 2007, Jeffrey Vidic, Ph.D., completed a PRTF.  [R369-82]. He indicate that Plaintiff's bipolar disorder and anxiety disorder were "in remission w/ OP tx and meds," that Plaintiff had a mild functional limitation with respect to activities of daily living, and that Plaintiff had moderate functional limitations with respect to maintaining social functioning and maintaining concentration, persistence, or pace. [R372, 374, 379].  Dr. Vidic wrote that Plaintiff was currently taking Buspar, Seroquel,

---

[9]      Remeron (mirtazapine) is an anti-depressant.  MedlinePlus, Mirtazapine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697009.html  (last  visited 03/22/11).

[10]      Zyprexa (olanzapine) is an anti-psychotic that is used to treat schizophrenia  and  bipolar  disorder.  MedlinePlus,  Olanzapine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html  (last  visited 03/22/11).

and Depakote.[11]  [R381].  He noted that "Dr. Rush indicates that claimant can perform simple unskilled work, this opinion is consistent with the recent MSE [mental status exam, presumably referring to August 7, 2007], and is given great weight."  [R381].  He further noted that Plaintiff's allegations were partially credible "in that [s]he does have a Bipolar Disorder and GAD [generalized anxiety disorder], but the alleged severity of functional limitations by her mental disorders are not supported by the evidence in file."  [R381].

Dr. Vidic also completed a mental residual functional capacity ("RFC") assessment on November 15, 2007.  [R383-396].  He noted that Plaintiff was moderately limited in the ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or proximity to others without being distracted by them; (5) interact appropriately with the general public; and (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. [R383-84].  He concluded by noting the following.  First, "Claimant can follow rules and

---

[11]    Depakote (valproic acid) is used to certain types of seizures, as well as mania in people with bipolar disorder.  MedlinePlus, Valproic Acid, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html (last visited 03/22/11).

11

remember simple 1 or 2 step instructions." [R385]. Second, "Claimant can attend to simple, repetitive tasks for 2 hour blocks of time, 40 hours per week without significant interference from psychiatric symptoms. Claimant can make simple work-related decisions and respond to minor changes in work routine with minimal supervision." [R385]. Third, "Claimant should not work with the public or in close coordination with others. Claimant can work in the presence of others and accept supervision and feedback regarding job performance." [R385]. Fourth, "Claimant can make simple plans, set simple goals, and avoid common workplace hazards. Claimant can use public transportation. Claimant can maintain appropriate appearance and hygiene." [R385].

Notes from a January 2008 visit with Jean Taylor, A.P.R.N., at CCCSB indicated that Plaintiff's medication response was minimal, that her Seroquel and Zyprexa were discontinued "as not effective for mood/sleep," and that the diagnostic impression was that Plaintiff was bipolar and had post-traumatic stress disorder ("PTSD"). [R430]. In February 2008, Plaintiff's trazodone[12] was discontinued. [R427].

Notes from a March 2008 CCCSB visit with Charlotte Ingram, A.P.R.N., indicated that Plaintiff experienced tactile hallucinations, was worried, had fitful sleep

_____

[12] Trazodone is a serotonin modulator used to depression. *See* MedlinePlus, Trazodone, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited 03/10/11).

(with "frequent awakening due to vivid dreams about dead family members"), and had a subdued mood, yet Plaintiff was coherent. [R429]. Ms. Ingram wrote "poor efficacy" for Plaintiff's medication response, though Plaintiff reported doing "a little better" once she started taking her medications again and started watching what she ate. [R429]. Ms. Ingram noted that Plaintiff's bipolar disorder was in remission and that Plaintiff reported having PTSD since the events of September 11, 2001, when she worked as an emergency rescue dispatcher. [R429]. Plaintiff's medications were Depakote 500mg and Seroquel 200mg. [R429].

There were no significant changes for the April 2008 and July 2008 CCCSB visits. [R425-26, 428].

On April 14, 2008, William Battles, M.D., of Cobb Mental Health Center ("CMHC") completed an RFC assessment. [R417-18]. Dr. Battles reported that Plaintiff had a mild degree of impairment in her ability to relate and respond appropriately to people, and a moderate degree of impairment with respect to her daily activities, deterioration in personal habits, constriction of interests, and her ability to understand, carry out, and remember instructions and respond appropriately to supervision. [R417]. Further, Plaintiff had a "marked" impairment (i.e., an impairment that seriously affected her ability to function and that resulted in unsatisfactory

13

performance) with respect to her ability to maintain attention and concentration, function independently to complete tasks, respond to customary work pressures, demonstrate reliability, maintain persistence and pace, and perform simple, complex, repetitive, and varied tasks.  [R417-18].  Dr. Battles indicated that the estimated onset date for these degrees of impairments was December 5, 2006.  [R418].  Finally, Dr. Battles indicated that the side effects of psychotropic medications did not further diminish Plaintiff's functional capacity.  [R418].

In September 2008, Plaintiff was diagnosed with HIV.  [R485, 491].

At a December 2008 visit with Ann Paley, M.D., of CMHC, the notes indicated Plaintiff's trazodone made her nauseous and gave her diarrhea, and she was advised to take it with food instead of on an empty stomach.  [R424].

In January 2009, Dr. Paley completed an RFC assessment.  [R420-21].  Dr. Paley reported that Plaintiff had a mild degree of impairment with respect to a constriction of interests, had a moderate restriction of daily activities, and had a moderate degree of impairment with respect to her personal habits and her ability to relate and respond appropriately to people,  carry out and remember instructions, function independently to complete tasks, demonstrate reliability, and perform simple, repetitive, and varied tasks.  [R420-21].  Further, Plaintiff had a marked impairment with respect to her

14

ability to maintain attention and concentration, respond appropriately to supervision, respond to customary work pressures, perform complex tasks, and maintain persistence and pace. [R420-21]. Like Dr. Battles, Dr. Paley indicated that the estimated onset date for these degrees of impairments was December 5, 2006, and that the side effects of psychotropic medications did not further diminish Plaintiff's functional capacity. [R421].

For a February 16, 2009, visit to an HIV clinic, the notes of Jennifer Smith, R.N., A.P.R.N., indicated that Plaintiff reported being very fatigued all the time and having body pains/aches. [R485]. Notes from March 2009 visit indicated that Plaintiff had an undetectable viral load. [R483].

On February 17, 2009, Valerie Walters, L.A.P.C. (licensed associate professional counselor), of the Cobb County Health Department completed an RFC assessment. [R565-66]. She indicated for Plaintiff a mild degree of impairment with respect to Plaintiff's ability to relate and respond appropriately to people, demonstrate reliability, and perform simple or repetitive tasks. [R565-66]. She also indicated a moderate degree of impairment with respect to the restriction of daily activities, the deterioration in Plaintiff's personal habits, and Plaintiff's ability to understand, carry out, and remember instructions, maintain attention and concentration, respond appropriately to

AO 72A
(Rev.8/8
2)

supervision, function independently to complete tasks, perform complex or varied tasks, and maintain persistence and pace.  [R565-66].  Further, she indicated a marked degree of impairment with respect to a constriction of interests and Plaintiff's ability to respond to customary work pressures.  [R565-66].  Ms. Walters estimated the onset date for these degrees of impairment to be December 2006, and she indicated that the side effects from psychotropic medications further diminished Plaintiff's functional capacity.  [R566].  With respect to side effects, Ms. Walters noted that the Seroquel caused Plaintiff dry mouth, sedation, drowsiness, dizziness, weakness, sluggishness, and an upset stomach, while the Depakote caused Plaintiff abnormal thinking, constipation, depression, diarrhea, emotional changeability, headache, "incoordination," insomnia, memory loss, and weakness.  [R566].

At a March 4, 2009, CCCSB visit, Plaintiff continued to talk about how she "went through PTSD" following September 11, 2001.  [R423].  She reported anxiety, stress, and lack of sleep.  [R423].  Plaintiff's Seroquel was increased to 300mg. [R423].

On March 17, 2009, Plaintiff was evaluated at Family Behavioral Health, apparently by Angela Dawson, M.D.  [R541-44].[13]  Plaintiff complained of anxiety attacks, vivid dreams, difficulty staying asleep, poor concentration, difficulty focusing, racing thoughts, being very hyper at some times but with low energy at others, excessive worry, mood swings, and being short-fused, among other things.  [R541].  The notes also indicated that Plaintiff spoke in the third-person sometimes, and that Plaintiff continued to have anxiety attacks in September and around patriotic holidays.  [R541].  Plaintiff was diagnosed with bipolar disorder, generalized anxiety disorder, and panic disorder without agoraphobia.  [R543].  Dr. Dawson indicated that Plaintiff had a moderate level of impairment with respect to activities of daily living, social functioning, concentration, and adaptation.   [R544].   Plaintiff was prescribed klonopin,[14] Seroquel, trazodone, and what appears to be Depakote.  [R544].

---

[13]      While the five pages cited appear to be part of the same set of documents, they are not obviously so.  Further, the page with Dr. Dawson's signature contains handwriting with prescriptions written in cursive, while the other pages contain writing in print.  [R541-44].

[14]      Klonopin (clonazepam) is a benzodiazepine that is used to control certain types of seizures and to relieve panic attacks.  *See* MedlinePlus, Clonazepam, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html   (last   visited 03/10/11).

AO 72A
(Rev.8/8
2)

At a follow-up appointment at Family Behavioral Health on March 31, 2009, the notes indicated that Plaintiff stated she was always tired and had low energy but that the anxiety was better (though it was still present).  [R534].  Plaintiff's medications included klonopin and Xanax[15].  [R534].  At another follow-up, on April 30, 2009, the notes indicated that Plaintiff reported that the Xanax "took the edge off" her anxiety but that it was still there, and that Plaintiff's PTSD was starting to affect her again because Memorial Day was approaching.  [R532].

That same day (April 30, 2009), Dr. Dawson completed an RFC assessment. [R525-26].  Dr. Dawson indicated that Plaintiff had a moderate degree of impairment with respect to the restriction of her daily activities, the deterioration in her personal habits, and her ability to relate and respond appropriately to people, understand, carry out, and remember instructions, respond appropriately to supervision, demonstrate reliability, maintain persistence and pace, and perform simple, complex, repetitive, and varied tasks.  [R525-26].  Dr. Dawson further indicated that Plaintiff had a marked degree of impairment with respect to a constriction of interests and the ability to

---

[15]    Xanax (alprazolam) is a benzodiazepine used to treat anxiety disorders and panic disorder. Medline Plus, Alprazolam, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html (last visited 03/22/11).

AO 72A
(Rev.8/8
2)

respond to customary work pressures.  [R525].  "At times," Plaintiff also had a marked degree of impairment with respect to her ability to maintain attention and concentration. [R525].  Dr. Dawson estimated the onset date for these degrees of impairment to be December 2006, although she indicated that the first visit "here" was March 17, 2007. [R526].  She also indicated that the side effects from psychotropic medications further diminished Plaintiff's functional capacity, and commented that Plaintiff "[a]lways feels drugged, sleepy & tired, she doesn't it [*sic* (perhaps meaning "believe")] its from all meds or from HIV diagnosis."  [R526].

On May 22, 2009, Africa Alvarez-McLeod, M.D., completed fatigue and pain questionnaires.  [R560-63].  On the fatigue questionnaire, Dr. Alvarez-McLeod indicated the following by checking the appropriate boxes: (1) Plaintiff suffered from recurrent or chronic fatigue that was not a consequence of exertion or weight bearing and that was not resolved by ordinary bed rest; (2) it was medically reasonable for Plaintiff to require supine rest for a minimum of two hours during the daytime; (3) Plaintiff needed to elevate her legs on a daily basis; (4) Plaintiff had an underlying medical disorder that contributed to recurrent or chronic fatigue (here, Dr. Alvarez-McLeod noted that Plaintiff was HIV-positive and suffered from generalized anxiety disorder and PTSD); (5) side effects from prescription medicines were contributing to

19

Plaintiff's recurrent or chronic fatigue; (6) Plaintiff was psychologically limited in her ability to work secondary to recurrent or chronic fatigue; (7) Plaintiff experienced diminished attention, concentration, and/or memory on a persistent basis as a result of recurrent or chronic fatigue; (8) Plaintiff experienced marked or severe difficulties sustaining daily activities or completing ordinary tasks in a timely manner due to recurrent or chronic fatigue; (9) Plaintiff had not been physically capable of performing a full eight-hour work day (including sedentary occupations) given her alleged recurrent or chronic fatigue; and (10) the above-noted impairments persisted or could have been expected to last for at least twelve months. [R560-61]. Dr. Alvarez-McLeod indicated that the severity of Plaintiff's recurrent or chronic fatigue was moderate, and that Plaintiff was credible regarding the frequency, duration, severity, and other features of her alleged fatigue. [R561]. On the pain questionnaire, Dr. Alvarez-McLeod noted moderate pain in the upper back and shoulders that occurred daily when doing housework and that was "probabl[y] degenerative disc / arthritis." [R562]. Plaintiff had decreased range of motion and strength in her upper extremities, but she had no insurance and so was unable to afford radiographic tests. [R562]. Dr. Alvarez-McLeod further indicated that: (1) it was medically reasonable for Plaintiff to need to lie down for a minimum of two hours during the daytime; (2) Plaintiff needed to elevate her legs

on a daily basis; (3) Plaintiff was psychologically limited in her ability to work secondary to her alleged pain; and (4) Plaintiff had not been physically capable of performing a full eight-hour work day (including sedentary occupations) since the onset date, given her alleged disabling pain.  [R562].

Notes from a May 28, 2009, visit to Family Behavioral Health indicated that Plaintiff had been taking only one Xanax because she had been experiencing increased fatigue, and that while the nervousness was still there, the edge was gone.  [R530].  The notes also indicated that Plaintiff "got through" Memorial Day without having flashbacks or auditory hallucinations, although she still had racing thoughts.  [R530].

On June 8, 2009, Ms. Walters (L.A.P.C.) of the Cobb County Department of Health completed another RFC assessment.  [R478-79].  She reported that Plaintiff had a moderate degree of impairment with respect to the deterioration in Plaintiff's personal habits, a constriction of interests, and Plaintiff's ability to relate and respond appropriately to people, understand, carry out, and remember instructions, maintain attention and concentration, respond appropriately to supervision, function independently to complete tasks, demonstrate reliability, and perform simple, complex, repetitive, and varied tasks.  [R478-79].  Further, Ms. Walters indicated that Plaintiff had a marked degree of impairment with respect to the restriction of her daily activities

and her ability to respond to customary work pressures and maintain persistence and pace. [R478-79]. Ms. Walters estimated the onset date for these degrees of impairment to be March 2009, and she indicated that side effects from psychotropic medications further diminished Plaintiff's functional capacity. [R479]. In the comments portion of the evaluation, Ms. Walters wrote that Plaintiff reported symptoms such as fatigue, irritability, anger, depression, forgetfulness, crying spells, psychomotor retardation, and decreased isolation. [R479]. Ms. Walters opined that these symptoms "may be side-effects from psychotropic medications, and have worsened since March 2009." [R479].

### C.     Evidentiary Hearing Testimony (R23-57)

At the hearing before the ALJ, the ALJ asked Plaintiff if she knew the names Battles, Paley, Walters, Dawson, and Alvarez-McLeod. [R28-31]. Plaintiff did not recognize the names Battles and Paley, but she identified Valerie Walters as the counselor she saw on a week-to-week basis (which she found helpful, [R33]), identified

22

Angela Dawson as the psychiatrist she saw from April 2009 to May 2009,[16, 17] and identified Dr. Alvarez-McLeod as "the doctor at the health department of Cobb and Douglas County that prescribes my medications and they handle my medical conditions." [R31].

Regarding chores, Plaintiff testified that she cooked dinner, did laundry, vacuumed, and mopped. [R31]. She stated that her legs got tired on a regular basis, that she felt fatigued during the day, and that anytime she exerted herself she had to lay down for an hour or two to rest her legs, where she would get pain from the back of her calf to her ankles. [R31-32]. She reported spending about four hours a day off of her feet. [R32]. Although Plaintiff drove a car, [R28], she did not take certain medication if she had to drive because they made her feel too drugged. [R39].

_____

[16]    The transcript of the hearing actually states the year of treatment as 2008, not 2009, [R29-30], but this is not consistent with the record, [*see* R525-26, 532, 534, 541-44]. Further, when Plaintiff testified that Dr. Dawson saw her "from April 2008 . . . until the end of May," and the ALJ asked if Plaintiff meant May "[o]f this year," Plaintiff replied, "Of 2008, yes . . . ." The hearing, however, took place in 2009. This suggests that either the transcript is incorrect or that the ALJ did not hear Plaintiff when she misspoke.

[17]    Explaining why she discontinued treatment with Dr. Dawson, Plaintiff stated that she was informed that she could not see two psychiatrists, and since she was already seeing one at the Cobb and Douglas County Public Health Department, she ended her relationship with Dr. Dawson. [R30].

23

As for medications, Plaintiff testified that she took three for HIV, one for herpes, two for hypertension, three for bipolar disorder, two for anxiety, one for her sinuses, and one for her stomach, along with any pain medication as needed. [R32]. While the medication made her anxiety and panic attacks less severe, [R43], she reported that because of the side effects, she felt drugged and "very very tired" all day. [R32].

Plaintiff testified that she had difficulty concentrating, had racing thoughts, and sometimes had to write things down to stay focused because she would forget what she was doing. [R33, 43]. She stated that she had panic attacks on a daily basis, got overwhelmed very easily, and would become frustrated when she could not perform something correctly. [R33-34]. She further related that she had two "bad" days a week when she felt very depressed and irritable and did not want to get out of bed. [R40]. On the other days, it took her two hours to wake up, then she had to sit on her sofa with her legs up in the recliner before taking a shower or doing other things, and eventually she would take a two-hour afternoon nap. [R40-41].

After an emergency room visit in August 2006 for abdominal pain, Plaintiff stated that she had not been back to any emergency room since that time. [R34].

Plaintiff also testified that she listed May 28, 2006, as her disability onset date because that was the date that she last worked. [R35]. At that time, her job had been

24

as a security guard / dispatcher at Peachtree Center Mall. [R35].  She stated that she left that job because she felt overwhelmed, had racing thoughts, felt that the depression "had started setting in," and also was trying to take care of her ailing mother.  [R35]. "[B]etween trying to take care of her, working different shifts and dealing with my depressions, it just became too unbearable for me to try to function on a day-to-day basis."  [R35].  She also stated that she was told that her job performance was being affected.  [R35-36].

Prior to that position, she worked for a few months at Atlanta Southeast Airlines as a flight scheduler, and before that she worked at MCI, calling potential customers to solicit them for phone service.  [R36].  She left both jobs due to stress.  [R36-37]. Before that, she worked for thirteen years as a 911 dispatcher in New York.  [R37].

Plaintiff represented that her depression started in 1996. [R37].  Asked what was different in May 2006, she stated that she did not think she had the correct medication and that everything seemed to have gotten worse.  [R38].  Plaintiff also noted her PTSD, which caused flashbacks and auditory hallucinations.  [R43].

Regarding social interactions, Plaintiff reported that church was the only social outlet she had.  [R42].  In a work setting, Plaintiff stated that she found dealing with people and their different personalities irritated her.  [R42].

25

Next, the ALJ questioned the vocational expert ("VE"). [R44-52]. Referring to Plaintiff's previous jobs, the VE testified that there is a good deal of stress associated with a dispatcher position, and that there would be more than marginal stress associated with crew scheduling and telemarketing positions. [R46]. The ALJ asked the VE whether there would be any unskilled, entry-level occupations for an individual of Plaintiff's age, education, and work history (1) who was able to perform work at the light exertional level (2) that consisted of no more than simple, routine, repetitious tasks with one- or two-step instructions and (3) that did not require more than occasional contact with coworkers or supervisors and did not require interaction with the public to perform the job duties. [R46]. The VE responded that one example would be an assembler (6,000 jobs in the region, and over 200,000 nationally), and another would be a laundry worker (4,000 jobs in the region, and over 200,000 nationally). [R46, 48]. The VE testified that the laundry-worker position would be marginally stressful, while the assembler position would be more than marginally stressful "for the most part" because of the pace. [R48]. The VE testified that if the hypothetical worker needed an unscheduled basis during the workday to lie down for two hours, that person would not be able to sustain any work. [R49]. Plaintiff's counsel asked what the impact would be if Plaintiff's symptoms were such that she was unable to maintain persistence and

26

pace at a satisfactory level, and the VE replied that work at less than a satisfactory level would preclude any type of competitive work. [R49-50]. The VE further testified that if a person could not respond to customary work pressures at the SVP 2 level, that would preclude all types of work. [R50]. In addition, the VE testified that if the hypothetical worker was only able to satisfactorily maintain attention and concentration for 50% of the time, that would also preclude all types of competitive work. [R50]. Finally, the VE testified that if the worker was reacting inappropriately to coworkers and supervisors between 1/3 and 2/3 of the time, that person would not be able to keep a job. [R52].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.   The claimant has not engaged in substantial gainful activity since May 28, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: herpes, HIV, bipolar disorder, and post-traumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

. . .

27

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

. . .

5.      The claimant has the residual functional capacity (RFC) to perform work that does not require: exertion above the light level (20 CFR 404.1567(b) and 416.967(b)); or more than simple, routine, repetitious tasks, with one- or two-step instructions; or more than occasional contact with coworkers or supervisors; or any interaction with the public.

. . .

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

7.      The claimant was born on March 20, 1959 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.  (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

28

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

. . .

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 28, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[R13-21].

With respect to Plaintiff's limited ability to handle stress, the ALJ noted that while the state agency consultative psychological examiner found Plaintiff able to understand, remember, and carry out detailed instructions but indicated that she would need a low-stress, minimally demanding setting, the ALJ found this consistent with the adopted RFC, which limited Plaintiff to simple, routine tasks. [R15, 18-19]. The ALJ also noted that Plaintiff was found to be able to adhere to a work-like schedule and meet production norms. [R18]. Further, the ALJ questioned Plaintiff's testimony regarding her inability to handle stress, noting that: (1) the record did not show that she was unable to handle the stress of her dispatcher job prior to her alleged disability onset date; and (2) Plaintiff's ability to maintain a home with her ailing mother at the time of her alleged onset date was not indicative of a person incapable of handling stress.

29

[R19].  The ALJ also noted Plaintiff's ability to maintain a driver's license and her conservative treatment record, as well as the VE's testimony that the jobs within the RFC required only marginal stress.  [R19].

Also with respect to Plaintiff's mental limitations, the ALJ stated that he would not rely on the "paragraph B" criteria (presumably referring to the psychiatric review technique described in 20 C.F.R. §§ 404.1520a, 416.920a and summarized on the Psychiatric Review Technique Form) as an RFC assessment because they are used to rate the severity of mental impairments at steps 2 and 3 of the five-part sequential evaluation process, whereas the mental RFC assessment used at steps 4 and 5 require a more detailed assessment (by itemizing various functions contained in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p)).  [R15-16].

The ALJ also noted Plaintiff's diagnoses of HIV and herpes and her testimony about fatigue and having "tired legs."  [R16].  Discounting this testimony as lacking "some substantial corroboration" in treatment records, the ALJ stated that: (1) aside from an emergency visit in August 2006 when her herpes was diagnosed, Plaintiff had required no hospitalizations or emergency interventions to address symptoms related to any physical impairment; (2) Plaintiff's treatment records concerning her physical

30

impairments were relatively routine and did not establish a level of impairment that would preclude work at the light exertional level; (3) the state agency non-examining medical expert found Plaintiff had no severe physical impairments; and (4) Plaintiff's treatment records contained no significant reference to fatigue, pain, weakness, or the requirement that Plaintiff needed rest or to raise her legs. [R17]. The ALJ similarly discounted Dr. Alvarez-McLeod's check-box form, stating that the answers were conclusory and did not contain citations to treatment records, and that the evidence supported a contrary conclusion. [R17].

In addition to discounting Plaintiff's testimony and Dr. Alvarez-McLeod's form, the ALJ also discounted the findings of four mental-health providers (Dr. Battles, Dr. Dawson, Dr. Paley, and Ms. Walters) who had indicated (according to the ALJ) some marked limitations (mostly relating to concentration, persistence, and pace) due to mental health issues. [R15, 18]. The ALJ stated that these were not acceptable medical sources but that he had carefully considered them anyway because they had each seen Plaintiff in their professional capacity. [R18]. The ALJ concluded that these opinions were not persuasive because they essentially consisted of checked boxes without any explanation or reference to treatment records, and the ALJ found the treatment records much more consistent with his own findings, which were in turn

31

supported by the state agency psychological expert opinions of record. [R18; *see also* R15 (noting that the other records indicated no-more-than-moderate limitations)].

## IV.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques, and they must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).   The Commissioner uses a five-step

sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that she is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that she is suffering from a severe impairment or combination of impairments that significantly limits her ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, she must prove that the impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that

33

there is other work available in the national economy that the claimant has the capacity to perform.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).   Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal

standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means more than a scintilla but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ's decision will not be overturned where "there is substantially supportive evidence" of the decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

AO 72A
(Rev.8/8
2)

## VI.   CLAIMS OF ERROR

Plaintiff generally argues that the ALJ's RFC assessment was incomplete and inaccurate.  [Doc. 12 at 1, 15].[18]  Specifically, Plaintiff argues that the ALJ erred by: (1) attempting to accommodate Plaintiff's ability to deal with stress by limiting the RFC to simple, routine tasks with one- or two-step instructions, [R16]; (2) rejecting limitations related to Plaintiff's symptoms of fatigue, [R18]; and (3) rejecting the opinions of three treating physicians and Plaintiff's counselor regarding the severity of Plaintiff's mental health symptoms and their impact on her ability to work, [R23].

### A.   The RFC's Accommodation of Plaintiff's Stress

Plaintiff argues that the ALJ's assumption that people who do simple, one- or two-step tasks do not experience the stress they would otherwise experience at work is inconsistent with SSR 85-15, which notes that "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job."  [Doc. 12 at 16-17 (quoting SSR 85-15,

_____

[18]     For clarity, when discussing the parties' briefs, the Court will refer to the page numbers listed in the briefs themselves, not the PDF files on the docket.

1985 WL 56857 at *6)]. Further, according to Plaintiff, the ALJ assumption's that a job with simple, repetitive tasks would provide a low-stress environment for Plaintiff is inconsistent with the evidence. [Doc. 12 at 17]. In support of this, Plaintiff cites the following: (1) while Plaintiff maintained a home with her ailing mother, Plaintiff stated she was sometimes irritable and mean to her mother, and explosive and angry for no reason; (2) Plaintiff experienced stress at work when she thought others were talking down to her; (3) Plaintiff experienced panic attacks by just being around people and running late; (4) Plaintiff experienced stress because of medication side effects and by persistently worrying about her health and psychiatric problems; (5) Plaintiff's vivid dreams gave her anxiety attacks; and (6) Plaintiff experienced stress when thinking about financial stressors, her child support issues in New York, the man who knowingly gave her herpes, and fall and winter (because of the holidays and the anniversary of her sister's death). [Doc. 12 at 17-18 (citing R259-60, 290, 325, 331, 335-38, 428-29, 431, 527]. Finally, Plaintiff argues that the ALJ ignored or misunderstood the VE's testimony that the assembler position was simple, unskilled work but would be " 'more than marginally stressful' " because of the need to keep up with the production rate. [Doc. 12 at 18 (quoting R48)].

37

In response, the Commissioner states that the ALJ noted the fact that Plaintiff had stopped work to care for her ailing mother not because that fact showed that Plaintiff did not experience stress, but instead to show that Plaintiff could handle more stress than she alleged. [Doc. 13 at 5 (citing R14)]. To show that Plaintiff could handle some stress, the Commissioner observes that: (1) the ALJ noted that while Plaintiff exhibited some symptoms of PTSD, at the time of her alleged onset date she had been working as a dispatcher for about eight months; and (2) Dr. Rush – while noting Plaintiff's need for a low-stress, minimally demanding setting – found that Plaintiff could adhere to a work-like schedule and meet production norms. [*Id.* at 5-6 (citing R19, 35-36, 288-91)]. Further, the Commissioner contends that ALJ properly discounted the opinions of certain medical sources as not supported by the record. [*Id.* at 6]. Regarding SSR 85-15, the Commissioner argues that that ruling relates to findings under the Medical-Vocational Guidelines and merely indicates that the ALJ should make an individualized RFC finding when mental limitations are involved. [Doc. 13 at 7]. The Commissioner asserts that the ALJ did not assume that an unskilled job was low-stress, but rather the ALJ considered all of the evidence and made a particularized finding that – given the various medical evidence – Plaintiff could perform simple tasks. [*Id.* (citing R16-19)].

Further, the Commissioner states that while the ALJ erred in suggesting that the VE testified that the jobs he identified would be no more than marginally stressful (when in fact the VE testified that the assembler job would be more than marginally stressful because of the need to keep up with a production rate), this was harmless error. [*Id.* at 8]. In support of this argument, the Commissioner asserts that: (1) Dr. Rush opined that Plaintiff would be able to keep up with production norms; and (2) the jobs identified by the VE were merely representative jobs, and even the laundry-worker job would still represent a significant number of jobs in the national economy that Plaintiff could perform. [*Id.*]. As a result, according to the Commissioner, both the ALJ's RFC finding and the finding that Plaintiff could perform other work existing in significant numbers in the national economy were supported by substantial evidence. [*Id.* at 9].

In reply, Plaintiff argues that while the ALJ "accepted" Plaintiff's limited ability to tolerate stress, he failed to identify what caused Plaintiff's excessive stress. [Doc. 14 at 1]. Plaintiff states that the Commissioner "claims that the ALJ explicitly explained what evidence showed [Plaintiff] would experience stress if she were restricted to simple tasks, but fails to cite or quote any explanation, but only cites a range of four pages of his decision." [*Id.* at 1-2 (footnote omitted)]. According to Plaintiff, the Commissioner's brief incorrectly argues that the ALJ could rely on a

AO 72A
(Rev.8/8
2)

restriction to simple work without determining whether factors that Plaintiff finds stressful are eliminated by the restriction. [*Id.* at 2]. Plaintiff argues that an ALJ may rely on VE testimony only where the hypothetical question fairly accounts for all impairments accepted by the ALJ, and the hypothetical question here could not have accommodated for stress because the ALJ never determined what would be stressful for Plaintiff. [*Id.*]. Finally, Plaintiff asserts that the Commissioner does not respond to Plaintiff's argument that the ALJ's presumption that simple work would be low-stress for Plaintiff cannot be reconciled with Plaintiff's various stressors (that she is stressed when she feels people are talking down to her, when she is merely around people, when she is worrying about financial and health problems, when she is suffering from the side effects of her medications, when she has bad dreams, on the anniversary of past stresses, etc.). [*Id.* at 3]. According to Plaintiff, because the ALJ accepted Plaintiff's limitations on the ability to tolerate stress but did not identify its causes, his finding about what she is capable of doing is at least incomplete, and his decision is therefore not supported by substantial evidence. [*Id.*].

In addressing the RFC in issue, the Court finds SSR 85-15 instructive:

Because response to the demands of work [i.e., stress, SSR 85-15, 1985 WL 56857 at *6] is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have

40

in meeting the demands of the job.  A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job.  [F]or example, a busboy need only clear dishes from tables.  But an individual with a severe mental disorder may find unmanageable the demands of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress.  Similarly, an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the knowledge that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons. Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.

SSR 85-15, 1985 WL 56857 at *6.  In this light, the adopted RFC – limiting work, in relevant part, to no more than "simple, routine, repetitive tasks, with one- or two-step instructions; or more than occasional contact with coworkers or supervisors; or any interaction with the public" [R16] – is insufficient to the extent that it purports to accommodate Plaintiff's need for "a low-stress, minimally demanding setting." [R18].  While the Commissioner asserts that the ALJ "considered all of the evidence and made a particularized finding for Plaintiff that given the various medical evidence, she could perform simple tasks," [Doc. 13 at 7 (citing R16-19)], it is unclear how the cited pages of the ALJ's opinion support that statement.  The ALJ's opinion did note that the Plaintiff could drive, maintain a household, and take care of her mother, "so I cannot find that her limitations with dealing with stress preclude simple, routine, repetitive

41

tasks," [R15; *see also* R19], but – as Plaintiff notes – there were numerous other sources of stress for Plaintiff apart from taking care of her mother. [Doc. 12 at 17-18; Doc. 14 at 3]. While the adopted RFC at least partially accommodates Plaintiff's stress of being around others, her others stressors (worrying about her health, finances, and children; seasonal- and holiday-based stressors; vivid dreams; medication side effects; feeling overwhelmed, etc., [Doc. 12 at 17-18; Doc. 14 at 3]), do not appear to have been considered by the ALJ.

However, the Court concludes that any error was harmless. After the VE identified two jobs that Plaintiff could perform despite her impairments as listed by the ALJ - - assembler and laundry worker, [R46-47], the ALJ asked the VE about the stress level for both of those positions. In response, the VE concluded that the assembler position would be more than marginally stressful because of production requirements, while the laundry worker position would only be "marginally stressful." [R48].

Nonetheless, because, as will be explained below, the Court determines that the ALJ must reevaluate the opinions of Dr. Battles, Dr. Dawson, and Dr. Paley using the

AO 72A
(Rev.8/8
2)

proper legal standards, on remand the ALJ should consider the relevance of those opinions to the stress issue as well.[19]

### B.    Plaintiff's Symptoms of Fatigue

Plaintiff next argues that (1) the ALJ did not apply the proper legal standards in evaluating Plaintiff's testimony about fatigue and (2) the evidence supports the degree of fatigue Plaintiff reported that she experienced.  [R19, 21].  Plaintiff contends that once an ALJ has found a medically determinable impairment that could reasonably be expected to produce the claimed symptoms, the ALJ may not reject a claimant's statements about the intensity of the symptoms solely because objective medical evidence does not substantiate the statements.  [Doc. 12 at 19 (citing 20 C.F.R. § 404.1529(c))].  Rather, according to Plaintiff, a claimant's symptoms will be determined to diminish the claimant's capacity for basic work activities to the extent they can be reasonably accepted as consistent with the objective medical evidence, and the ALJ must determine whether there are any conflicts between the claimant's statements and the other evidence.  [*Id.* (citing 20 C.F.R. § 404.1529(c)(4))].  Yet here, states Plaintiff, the ALJ did not mention any such conflicts.  [*Id.*].  In light of this law,

---

[19]    As a result, on remand, the ALJ should either: (1) fashion a new RFC that properly accommodates Plaintiff's stress; or (2) make determinations explaining how the current RFC already accommodates Plaintiff's stress level.

Plaintiff argues that the ALJ erred when – after noting Plaintiff's testimony about fatigue, and after finding that Plaintiff's medically determinable impairment could reasonably be expected to cause her alleged symptoms – he sought objective medical evidence to support his conclusion that Plaintiff's statement about the intensity, persistence, and limiting effects of her symptoms were not credible.  [*Id.* at 20].  According to Plaintiff, the ALJ improperly included fatigue with Plaintiff's other physical symptoms when suggesting that Plaintiff's fatigue and other physical symptoms were without substantial corroboration because they required no hospitalizations or emergency interventions.  [*Id.*].  Plaintiff argues that rather than looking at the extensive evidence corroborating Plaintiff's statement about the intensity of her symptoms, the ALJ found an inconsistency where none existed.  [*Id.*].  Plaintiff states that fatigue is not a condition that would be expected to result in hospitalizations or emergency interventions, so the absence of those indicates nothing about the severity of Plaintiff's fatigue.  [*Id.*].

With respect to Plaintiff's second point – that the evidence supports the degree of fatigue she reported – Plaintiff points to the May 2009 fatigue questionnaire completed by Dr. Alvarez-McLeod, as well as several treatment records from CMHC, the HIV Clinic, and Family Behavioral Health.  [*Id.* at 21-22 (citing  R290, 336, 338,

44

429, 432, 485, 491, 534, 560-61)].  Further, Plaintiff notes her own testimony about the trouble she had with daily activities because of the effects of her medications.  [*Id* at 22-23].

In summary, Plaintiff states that both her testimony and the medical evidence support the conclusion that she cannot work eight hours per day because of fatigue caused by her medications and illnesses.  [*Id.* at 19].  Plaintiff also notes the VE's testimony that a person who would need to lie down for a couple of hours during the workday could not sustain any work.  [*Id.* (citing R49)].

The Commissioner responds that, with respect to the standard to be used, if objective medical evidence does not confirm the severity of the alleged symptoms but, as here, the claimant establishes that she has an impairment that could reasonably be expected to produced the alleged symptoms, then the intensity and persistence of the alleged symptoms and their effect on the claimant's ability to work must be evaluated. [Doc. 13 at 10 (citing 20 C.F.R. §§ 4041529(c)(1), 416.929(c)(1); *Wilson*, 284 F.3d at 1225-26; SSR 96-7p, 1996 WL 362209 at *4)].  The Commissioner also states that in evaluating these symptoms, the ALJ may consider objective medical evidence, daily activities, precipitating and aggravating factors, and medication side effects, among other things.  [*Id.* (citing 20 C.F.R. §§ 4041529(c), 416.929(c))].  The Commissioner

45

then notes that while Plaintiff reported fatigue, the ALJ found her not credible because her complaints were inconsistent with treatment records (which the Commissioner says were relatively routine and did not establish a level of impairment that would preclude all work at the light exertional level) and Plaintiff's daily activities, and because Plaintiff had not required hospitalization or emergency intervention to address her symptoms (other than one 2006 emergency room visit when Plaintiff's herpes was diagnosed).  [*Id.* at 10-11].  The Commissioner points in particular to Dr. Rush, who opined that Plaintiff could perform on a work schedule, and who did not indicate that Plaintiff could not carry out a forty-hour workweek.  [*Id.* at 11 (citing R291)].

With respect to Dr. Alvarez-McLeod's fatigue questionnaire, the Commissioner notes that the ALJ found that this opinion was conclusory and that the evidence supported a contrary conclusion.  [*Id.* at 11-12].  The Commissioner then discusses treatment records, noting that they consisted of routine treatment – (summarizing) while Plaintiff sometimes complained of depressed mood, irritability, anxiety, helplessness, and low energy (among other things), she was also alert and oriented, and she showed improvement in her ability to control her emotions.  [*Id.* at 12-13].  Regarding Plaintiff's daily activities, the Commissioner notes that the ALJ considered that Plaintiff could do household chores and that medication was improving her anxiety and

46

panic attacks.  [*Id.* at 13-14].  In conclusion, the Commissioner asserts that the ALJ properly followed the Eleventh Circuit's standard in evaluating subjective complaints and considered both the medical evidence and other factors – including Plaintiff's activities of daily living – in determining that Plaintiff's fatigue was not as severe as she alleged and did not prevent her from working.  [*Id.* at 14].

In reply, Plaintiff first repeats her suggestion that it was inappropriate for the ALJ to reject her complaints about fatigue on the grounds that she was not hospitalized for it and that there was an alleged lack of substantial corroboration for it in the treatment records.  [Doc. 14 at 3-4].  Plaintiff then notes that the ALJ rejected Dr. Alvarez-McLeod's (a treating physician) opinion about the severity of Plaintiff's fatigue on the grounds that it was not supported by objective findings, yet Dr. Alvarez-McLeod attributed the fatigue to HIV, generalized anxiety, PTSD, and medications.  [*Id.* at 4].  According to Plaintiff, the ALJ accepted the presence of all the factors that Dr. Alvarez-McLeod said accounted for Plaintiff's fatigue and cited no contrary evidence, so the ALJ's conclusion amounted to substituting his own opinion for that of a qualified physician.  [*Id.*].  Plaintiff states that the ALJ cannot act as both judge and physician.  [*Id.* (citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring)].

47

Where, as here, a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate the intensity and persistence of the symptoms to determine how the symptoms limit a claimant's capacity for work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). Further, an ALJ cannot reject a claimant's statements about the intensity and persistence of her pain or other symptoms or about the effect her symptoms have on her ability to work solely because the available objective medical evidence does not substantiate her statements. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Nevertheless, "[w]hile subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)). In addition to the available objective medical evidence, the ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms, (5) treatment, other than medication, for relief of pain or other symptoms; (6) any measures used to relieve the pain or other symptoms (such as

48

sleeping on a board); and (7) other factors concerning the claimant's functional limitations and restrictions due to the pain or other symptoms.  *See Storey v. Comm'r of Soc. Sec.*, 181 F.3d 104 (Table), 1999 WL 282700, *2 (6th Cir. Apr. 27, 1999) (citing 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)).

Here, the ALJ noted Plaintiff's testimony but stated that "[w]ithout some substantial corroboration in the claimant's treatment records, I cannot find her testimony persuasive in establish[ing] a level of pain or fatigue which would preclude light work."  [R16-17].  The ALJ's reliance on a lack of substantial corroboration in treatment records directly contradicts the rule that an ALJ may not reject subjective testimony based solely on the lack of objective medical evidence supporting it, 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).  Because the Court determines that the case should be remanded on other grounds, on remand the ALJ should explicitly analyze the factors listed in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), to evaluate Plaintiff's credibility.

### C.   The ALJ's Rejection of Four Treating Sources

Plaintiff notes that four treating medical professionals – Plaintiff's counselor and three physicians – agreed that Plaintiff had marked difficulties in her ability to respond to customary work pressures and to maintain persistence and pace.  [Doc. 12 at 23].

Plaintiff also notes that all three physicians found "marked" limitation (i.e., an impairment " 'which seriously affects ability to function and results in unsatisfactory performance' ") in Plaintiff's ability to maintain attention and concentration. [*Id.* (quoting R420)].  Further, Plaintiff observes that the VE testified both that: (1) a person who is unable to maintain persistence and pace at a satisfactory level could not do any type of competitive work; and (2) a person who would not be able to respond to customary work pressures in a satisfactory way could not do any type of competitive work.  [*Id.* (citing R50)].  Plaintiff also argues that the ALJ was incorrect to state that the opinions were not from "acceptable" medical sources, given that each opinion other than that of the treating professional counselor was from an acceptable medical source. [*Id.* at 24].  Finally, Plaintiff asserts that while the ALJ claimed that the forms were essentially checked boxes without any explanation or reference to treatment records, some of the medical sources added written explanatory comments, all of them were accompanied by treatment notes that established the facts upon which the opinions were based, and there is no requirement that all of a treating physician's objective findings be included in a single document.  [*Id.*].  Finally, Plaintiff states that the Eleventh Circuit has determined that absent a reasonable basis for rejecting a treating physician's opinion, it should be accepted as true – therefore, Plaintiff argues, the opinions of

Plaintiff's treating physicians should be accepted as true.  [*Id.* (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1058 (11th Cir. 1986))].

The Commissioner responds by arguing that although the ALJ said that the opinions were not from acceptable medical sources, he considered them anyway and provided adequate reasoning for not giving them great weight (saying that they were conclusory and not supported by treatment notes), and therefore any error was harmless.  [Doc. 13 at 14 & n.1].  The Commissioner then discusses each of the four sources in turn, stating: (1) LPC Walters was not an acceptable medical source, her reasoning mostly included Plaintiff's subjective complaints, and her indication in June 2009 that Plaintiff's condition was worsening was contradicted by treatment notes that Plaintiff's condition was improving; (2) the three physicians' opinions were conclusory and unsupported by treatment records, and while Plaintiff argues that some forms included commentary, that commentary did not explain the checked boxes or reconcile them with the less severe condition reflected in treatment notes; (3) medical evidence showed that Plaintiff's thoughts were generally coherent and linear while she was on her medication; (4) Dr. Battles and Dr. Paley's opinions were inconsistent with their own treatment notes; (5) Dr. Dawson's notes indicated only moderate limitations in the areas of daily living, social functioning, concentration, and adaptation, and while they

51

reflected Plaintiff's complaints of fatigue, they did not indicate any functional or work-related restrictions; (6) the three physicians' opinions were inconsistent with the state agency expert's evaluation of all of the medical evidence; and (7) the record did not support a finding that Dr. Paley and Dr. Battles were treating physicians.  [*Id.* at 15-20].  Finally, responding to Plaintiff's argument that each of the four opinions should be credited as true (citing *MacGregor*, 786 F.2d at 1053), the Commissioner points to Eleventh Circuit opinions issued before *MacGregor* – *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985), and *Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir. 1982) – that remanded to the agency for further administrative proceedings despite finding that the treating physicians' opinion had not been properly refuted.  [Doc. 13 at 21].

In reply, Plaintiff states that it is difficult to see how any error could be harmless when the relevant legal standard makes opinions from treating physicians automatically entitled to greater weight.  [Doc. 14 at 4 (citing 20 C.F.R. § 404.1527(d))].  Plaintiff further asserts that the ALJ improperly rejected the opinions on the basis of non-examining physician opinions, which are not substantial evidence to reject a treating physician's opinion.  [*Id.* at 4-5 (citing *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988))].  In addition, Plaintiff notes the Eleventh Circuit's statement that conclusory

52

opinions "should not be considered in a vacuum, and instead the doctors' earlier reports should be considered as the bases for their statements to [plaintiff's] attorney." [*Id.* at 5 (quoting *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (*per curiam*) (alteration omitted; alteration in brief))].  According to Plaintiff, because the ALJ failed to give a reasonable basis for rejecting the treating physician's opinion, they should be accepted as true.  [*Id.* (citing *MacGregor*, 786 F.2d at 1058)].

The Commissioner evaluates every medical opinion that it receives, regardless of the source.  20 C.F.R. §§ 404.1527(d), 416.927(d).  Thus, both examining and nonexamining sources provide opinion evidence for the ALJ to consider in rendering a decision.  20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f).  In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record.  20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).  The opinion of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.  *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)

(citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)); *accord Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011).  Good cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips*, 357 F.3d at 1241.  When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons.  *Id.*  A one-time examining (i.e., consulting) physician's opinion is not entitled to great weight.  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004).  Also, in the Eleventh Circuit, "the report of a non-examining doctor is accorded little weight if it contradicts an examining doctor's report; such a report, standing alone, cannot constitute substantial evidence."  *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991); *see also Kemp v. Astrue*, No. 08-12805, 2009 WL 163019, *3 (11th Cir. Jan. 26, 2009).

The Court initially notes that the ALJ erred in stating that the three physicians mentioned above (Drs. Battles, Dawson, and Paley) were not acceptable medical sources.  Licensed physicians are acceptable medical sources.  *See* 20 C.F.R. §§ 404.1513(a), 416.913(a).  Only acceptable medical sources can give "medical opinions," which may be entitled to controlling weight under

54

20 C.F.R. §§ 404.1527(d), 416.927(d).  SSR 06-03p, 2006 WL 2329939 at *2.  Because the ALJ erred, the question for the Court is whether this error was harmless.  *See Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987) (applying harmless error analysis in Social Security case); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying harmless error analysis where the ALJ made an incorrect statement of fact).  Generally, an error is harmless in a Social Security case if it "do[es] not affect the ALJ's determination that a claimant is not entitled to benefits."  *Young v. Astrue*, No. 8:09-cv-1056, 2010 WL 4340815, *4 (M.D. Fla. Sept. 29, 2010).

The Commissioner is correct that, despite the error, the ALJ considered the opinions anyway and gave reasons for not giving them great weight, [Doc. 13 at 14 n.1], but the Commissioner implies – incorrectly – that the ALJ would not have been required to consider them were they from a non-acceptable medical source.  *See* 20 C.F.R. §§ 404.1527(b), 404.927(b) ("In deciding whether you are disabled, we will always consider the medical opinions in your case record *together with the rest of the relevant evidence* we receive.") (emphasis added); SSR 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all the available evidence in the individual's case record in every case.").  As a result, merely considering the opinions and providing a reason for rejecting them does not cure the error.  The

AO 72A
(Rev.8/8
2)

regulations require that the ALJ consider certain factors – among them the extent of the treatment relationship, if any – in deciding the weight to give to the opinion.  20 C.F.R. §§ 404.1527(d), 416.927(d).

Here, the ALJ stated that he rejected the opinions on the following grounds: (1) they were not consistent with the no-more-than-moderate limitations indicated in Plaintiff's treatment records; (2) none of the individuals was an acceptable medical source; and (3) none of the statements provides an explanation or citation to treatment records for the checked answer given.  [R16, 18].  While the first and third of these reasons address 20 C.F.R. §§ 404.1527(d)(3)-(4), 416.927(d)(3)-(4) (supportability and consistency), the ALJ did not address 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (the treatment relationship), as he was required to do.   20 C.F.R. §§ 404.1527(d), 416.927(d).  Although the ALJ's suggestion that the opinions were conclusory is unlikely to change, a conclusory opinion from an acceptable medical source receives more weight than a conclusory opinion from a non-acceptable medical source (other things being equal).[20]  *See Kelly v. Comm'r of Soc. Sec.*, No. 10-11533, 2010 WL

---

[20]   The Court recognizes that *Wilson* – the 1984 Eleventh Circuit case cited by Plaintiff, [Doc. 14 at 5] – states that the conclusory statements of two doctors to the plaintiff's attorney "should not be considered in a vacuum, and instead the doctors' earlier reports should be considered as the bases for their statements to Wilson's attorney," 734 F.2d at 518.  The Court does not read this statement, however, to stand

4121298, *3 (11th Cir. Oct. 21, 2010) ("Generally, the opinions of examining physicians are given more weight that non-examining physicians and the opinions of treating physicians are given more weight than non-treating physicians."); *see also* SSR 96-2p, 1996 WL 374188 at *4 ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").  The weight given to these particular opinions is especially important because the three physicians each described a marked limitation with respect

─────────────────────

for the broad proposition that an ALJ must accept a conclusory medical opinion even if it provides no explanations or citations so long as other treatment records from the evaluator exist.  The Eleventh Circuit's good-cause standard for discounting a treating physician's opinion appears to implicitly reject such an interpretation, because it holds that good cause is satisfied if the "treating physician's opinion was conclusory *or* inconsistent with the doctor's own medical records," *Phillips*, 357 F.3d at 1241(emphasis added) – in other words, an opinion can be rejected on the grounds that it is conclusory alone, without reference to the other records.

57

AO 72A
(Rev.8/8
2)

to Plaintiff's ability to maintain attention and concentration, [R417, 420, 525]  – a crucial factor in determining whether the ALJ's RFC encompassed all of Plaintiff's limitations, given that restricting an RFC to simple tasks alone does encompass problems of concentration, *see Winschel*, 631 F.3d at 1181 (remanding case where ALJ's RFC limited Plaintiff to unskilled or semi-skilled work, holding that ALJ must pose hypothetical question to the vocational expert that specifically accounts for claimant's moderate limitation in maintaining concentration, persistence, and pace); *see also Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (*per curiam*) (reversing affirmance of ALJ's decision where RFC limited claimant to simple tasks; holding that such description did not encompass documented limitations of concentration, persistence and pace, and citing SSR 85-15).  For this reason, the Court cannot say that error was harmless.

Given this conclusion, the Court turns to the appropriate remedy.  While a treating physician's opinion is deemed true as a matter of law if the ALJ ignores it or improperly refutes it, *see, e.g.*, *MacGregor*, 786 F.2d at 1053[21]; *Harris v. Astrue*,

---

[21]     The Court recognizes that the *MacGregor* Court held as a matter of law that a treating source's opinion is accepted as true where the Commissioner "has ignored or failed properly to refute a treating physician's testimony."  *MacGregor*, 786 F.2d at 1053.  This language arguably suggests that any error in evaluating a treating doctor's opinion will be treated as true.  However, the Court does not read

58

546 F. Supp. 2d 1267, 1282 (N.D. Fla. 2008), a court need not deem a treating doctor's opinion as true where "it is appropriate that the evidence be evaluated in the first instance by the ALJ pursuant to the correct legal standards." *Broughton*, 776 F.2d at 962. Here, because the ALJ did not ignore the opinions or fail to provide reasons for rejecting them but instead evaluated them under an incorrect standard (that is, evaluating them as non-acceptable medical sources), the Court concludes that the Commissioner need not treat these opinions as true on remand. Instead, the Commissioner should reevaluate these opinions using the correct legal standards.

Accordingly, the case is **REMANDED** for the ALJ to reconsider Dr. Battles, Dr. Dawson, and Dr. Paley's opinions using the proper legal standards.

---

*MacGregor* so broadly. First, as recognized in *Harris v. Astrue*, 546 F. Supp. 2d 1267 (N.D. Fla. 2008), in *MacGregor* the Commissioner *ignored* a treating doctor's opinion. *Harris*, 546 F. Supp.2d at 1282 (citing *MacGregor*, 786 F.2d at 1053). Second, Eleventh Circuit opinions preceding *MacGregor* have remanded for the Commissioner to reconsider treating doctors' opinions that were improperly considered. *See Broughton*, 776 F.2d at 962; *Wiggins*, 679 F.2d at 1390 (remanding for the ALJ to evaluate the weight given to treating doctor where the ALJ's opinion failed "to mention the . . . treating physician and the weight, if any, the ALJ gave to the treating physician's evidence and opinion," and where the court was unable "to determine whether the ALJ applied the proper legal standard" for weighing the doctor's opinions). As a result, the Court does not find that it must treat the physicians' opinions as true.

## VIII.  CONCLUSION

For the aforementioned reasons, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 29th day of March, 2011.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

60